**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

Case No. 23-cr-374 (JRT/DJF)

Plaintiff,

v.

**REPORT AND**
**RECOMMENDATION**

Isis Martinaz Brent (1), *also known as Jayda Marie White*; and Carvon Antonio Saine (2),

Defendants.

## INTRODUCTION

This matter is before the Court on Defendant Isis Martinaz Brent's Motion to Suppress Statements (ECF No. 37), and Motion to Suppress Witness Identifications (ECF No. 38); and Defendant Carvon Antonio Saine's Motion to Suppress Impermissibly Suggestive and Unreliable Identification (ECF No. 34), and Motion for Suppression of Evidence as a Result of Illegal Search and Seizure (ECF No. 35).[1]  The Court held a hearing on Defendants' motions on April 10, 2024. (ECF No. 46).  James S. Becker appeared on behalf of Ms. Brent and Caroline Brunkow appeared on behalf of Mr. Saine.  (*Id.*)  David Green appeared on behalf of the Government.  (*Id.*)  Based on the parties' written submissions, hearing testimony, and on the entire file, the Court recommends Ms. Brent and Mr. Saine's motions be denied.

## BACKGROUND

On December 20, 2023, the Government charged Ms. Brent and Mr. Saine each with Aiding and Abetting Carjacking in violation of 18 U.S.C. §§ 2 and 2119(1) ("Count 1"), and

---

[1] The undersigned United States Magistrate Judge considers this matter pursuant to a general referral in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1.

Aiding and Abetting Brandishing a Firearm in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A)(ii) ("Count 2") ("Indictment") (ECF No. 1). The charges stem from an alleged carjacking spree that occurred on October 6, 2023. (ECF No. 1; *see also* ECF No. 49, April 10, 2024 Hearing Transcript.)

A. **Incident Involving Victim A on the 3400 Block of 1st Avenue South**

During the hearing on April 10, 2024, Minneapolis Police Officer Melissa Dalnes, who works in the Fifth Precinct, testified that on October 6, 2023, she responded to a 911 call reporting an alleged carjacking incident involving an elderly woman that took place approximately one hour earlier. (ECF No. 49 at 122:17-21, Hearing Transcript; *see also* Joint Ex. 3, Officer Dalnes's Body Worn Camera Footage-Excerpt.) Officer Dalnes testified that she interviewed Victim A in Victim A's granddaughter's home and that her body-worn camera recorded the interview. (ECF No. 49 at 122:19-24; *see also* Joint Ex. 3.)

During the interview, Victim A explained that as she drove towards her granddaughter's home in South Minneapolis, she observed a group of five or six young people near a stoplight who she assumed were on their way home from school. (Joint Ex. 3 at :00-0:54.) Victim A stated that after parking her vehicle outside her granddaughter's home, she saw the group continue to walk along the same street. (*Id.* at 1:15-1:35.) Victim A said a female in the group turned around, approached her, and asked for her keys. (*Id.* at 1:36-1:47.) Victim A stated that when she hesitated, the female pulled a blackish-gray gun out of a bag and pointed it at Victim A. (*Id.* at 1:47-2:52.) Victim A said after she saw the gun, "she was in shock" and "all was dark." (*Id.* at 9:15–09:34.) Victim A explained that she complied and gave her keys to the female. When she did so, the female pushed Victim A out of the way, opened Victim A's car door, and got inside. (*Id.* at 2:55-3:00.) Victim A said soon after that, other members of the group approached her and

a male asked her for money and demanded her bags.  (*Id.* at 3:00-3:13.)  Victim A stated that when

she did not give the male her money or her bags, he forcefully took the bags from her, causing

Victim A to fall.  (*Id.* at 3:13-3:21; 9:12-9:13.)

Victim A described the individuals in the group as African American.  (*Id.* at 6:55-7:05.)

She described the female who took her keys as having a round face with short dark hair, having an

average build, wearing a teal head band, and approximately 16 years old.  (*Id.* at 6:39-8:15.)

Victim A said the male who took her purse was thin and tall, had a dark complexion, had short

hair, had no facial hair, dressed in dark clothing, and was approximately 16 years old.  (*Id.*

at 8:25-9:35.)  Victim A told Officer Dalnes she would likely recognize the female if she saw her

again, but "maybe not" the male.  (Joint Ex. 3 at 9:35-9:47.)  The police collected doorbell camera

footage that shows the suspects approaching Victim A and getting into her vehicle at

approximately 5:15 p.m. on October 6, 2023 ("Doorbell Camera") (Joint Ex. 20).

### B.    Incident Involving Victim B Near 4300 Chicago Avenue South

At approximately 6:20 p.m. on October 6, 2023, about an hour after the incident involving

Victim A, Minneapolis Police Department Officers responded to a call reporting an attempted

carjacking involving Victim B.  (Joint Ex. 21.)  Officer Leonard Gerten documented the call notes

in his report memorializing the incident:

> BEAUTY ROOM … PKG LOT … ATTEMPTED CARJACKING … 2 BM;S
> AND 1 BF WITH GUN … AND CLR SPED OFF. CLR IS RETURNING … #1
> BF 15-18YOA BLK PUFFY SHINY JKT CROP TOP AND PANTS.  #2 BM BLU
> HOODIE …. UNK #3. CLR THINKS THEY MAY STILL BE IN THE AREA …
> CLR ORIGINALLY SAW THEM BEHIND THE BIZZ … ONL Y SPACE
> ENUFF FOR 5 VEHS … CLR CB/ REQ ETA - STATING THE SUSP'S ARE
> STANDING OTS THE WALGREENS CURRENTLY/ TC ADV'D.

("Call Notes") (*Id.* at 1, capitalization in original.)  Officer Gerten testified that the Call Notes in

his report reflect verbatim the notes dispatch provided to him and his partner as they drove to

respond to the call.  (ECF No. 49 at 61.)

At approximately 6:40 p.m. another responding officer, William Martin, interviewed Victim B.  (*See* Joint Ex. 8, Officer Martin's Body Worn Camera Footage.)  Victim B stated that a female knocked on his window, said she needed his keys, then tapped a gun on the window, prompting Victim B to quickly reverse his vehicle to escape.  (*Id.* at 1:00-1:16.)  Victim B stated that the female was accompanied by "two kids"—one in a "blue hoodie" and the other wearing "light grey" (*id.* at 1:16-1:50) and said he could "for sure" identify the female who brandished a charcoal-colored gun at him (*id.* at 1:50-2:05).  Officer Martin did not ask Victim B how he we would recognize the female or describe what she looked like, nor clarify whether he got a good look at the female or if he was distracted when he saw her.  (*See id.* at 1:00-2:00.)

### C.    Detainment

#### 1.    Ms. Brent

Officer Gerten testified that while they were en route to respond to the incident involving Victim B, he and his partner heard on their radio that other officers were pursuing a group of juveniles on foot.  (ECF No. 49 at 50:6-50:12.)  He testified that shortly thereafter, he and his partner observed a group of juveniles running across the street, so they drove into a nearby alley to attempt to cut the juveniles off.  (*Id.* at 50:13-50:16.)  Body-worn camera footage shows Officer Gerten and his partner exiting their vehicle to pursue a Black female—later identified as Ms. Brent—and commanding her to get on the ground, roll over on her stomach, and put her hands behind her back.  (Joint Ex. 18, Officer Gerten's Body Camera Footage-Excerpt, at 0:10-0:25; *see also* ECF No. 49 at 51:1-51:6.)  As Officer Gerten handcuffed Ms. Brent, he asked her, "Why are you running from the police?".  (Joint Ex. 18 at 0:30-0:31.)  Ms. Brent told the officers she was scared and asked them to help her up.  (*Id.* 0:43-0:49.)  She also stated, "they was trying to take

his car" (*id.* at 0:46-0:47) and "I think he gave me something in that bag" (*id.* at 0:56-0:58). After she stood up, Ms. Brent said, "Yes. Look in my bag … they told me not to touch it." (*Id.* at 1:06-1:10.) Meanwhile, Officer Gerten's partner picked up several items scattered nearby, including a black shiny jacket, blue sweater, crocs, and a fanny pack. (*Id.* at 1:15-1:21.)

Before Officer Gerten put Ms. Brent in his squad car, she stated, "Please. I'm not going to jail. I didn't do anything." (*Id.* at 1:40-1:41.) Officer Gerten responded, "Ya. You're going to jail." (*Id.* at 1:41-1:42.) Officer Gerten and his partner both told Ms. Brent she was under arrest but neither provided a *Miranda* warning. (*Id.* at 1:42-1:44.) Officer Gerten told her to "just chill," and his partner stated, "you had the gun in your bag." (*Id.* at 1:45-1:48.) When Ms. Brent got upset, Officer Gerten stated, "Relax. Relax. Relax. We'll figure it out" (*id.* at 1:48-1:53) and repeated that she was under arrest, but again did not provide a *Miranda* warning (*id.* at 1:55-1:56). Ms. Brent repeated that someone else gave her the gun. (*Id.* at 2:06-2:07.) Officer Gerten replied, "We can talk. Just relax." (*Id.* at 2:08-2:10.) Officer Gerten testified that he and his partner recovered a handgun in a handbag Ms. Brent dropped near the area where they arrested her. (ECF No. 49 at 55:4-55:7.)

Officer Gerten also testified that he and his partner secured Mr. Brent in their vehicle and prepared to move her to another location because they were concerned about public safety:

> Given that I saw the group of juveniles had crossed right in that proximity of the houses that we made contact with the female, at that point I had not heard on the radio that those other suspects had been taken into custody; and I felt that at that point, in order for our safety and the safety of our arrestee, that we had to get them secured into the vehicle and get to a better location for tactical reasons and for our safety.

(Joint Ex. 49 at 53:21-54:3.) As they began to transport Ms. Brent, the officers' radio reported that police had "two more in custody." (Joint Ex. 18 at 2:48-2:50.) Soon after that, one the officers asked Ms. Brent, "So who had the gun?" (*Id.* at 2:55-2:56.) Ms. Brent responded that it

was someone else's gun and proceeded to make a number of statements about the roles other people allegedly played during the incident involving Victim B.  (Joint Ex. 19, Squad Car Footage, at 0:30-1:30.)

### 2. Mr. Saine

Sergeant Ryan Kelly testified at the April 10, 2024 hearing that he also responded to the incident involving Victim B.  (Joint Ex. 49 at 11:18-12:4.)  He said that he was "the second car on the scene" (*id.* at 12:22) and understood that three or four individuals, including a Black female and two Black males, attempted rob Victim B at gunpoint (*id.* at 11:24-12: 11).  Sergeant Kelly's Body-worn camera footage shows dispatch describing the suspects as "black female 15-18, she's wearing a black puffy shiny jacket and a crop top, and then two Black males, one of them wearing a blue hoodie, they did have a gun." (Ex. 11, Sergeant Kelly's Body Worn Camera Footage, at 0:45-0:58.)  Sergeant Kelly testified that while en route to the scene, he received an update that the suspects were standing in a Walgreens parking lot near where the incident with Victim B occurred and that the first responding squad car was now positioned there.  (Ex. 49 at 12:15-13:4.)  He explained that he positioned himself to cut off the suspects' escape route (*id.* at 13:1-13:8).  Sergeant Kelly testified that as he monitored radio traffic, he heard another officer state that a Black male suspect was running towards Chicago Avenue.  Almost immediately after that he saw Black male wearing a blue top and dark-colored jeans, who was later identified as Mr. Saine, emerging into the parking lot heading towards Chicago Avenue.  (*Id.* at 15:22-25; *see also* Joint Ex. 11 at 6:05-6:10.)  Sergeant Kelly testified he identified Mr. Saine as matching Victim B's description of one of the individuals who attempted to carjack him.  (Joint Ex. 49 at 15:22-16:4.)  Sergeant Kelly said Mr. Saine looked at him and then took off running.  (Joint Ex. 49 at 16: 2-16:4; *see also* Ex. 11 at 6:11-6:14.)  Sergeant Kelly testified that he told Mr. Saine to stop, but Mr. Saine

continued to flee.  (Joint Ex. 49 at 16:5-16:8; Joint Ex. 11 at 6:11-6:16.)  Sergeant Kelly stated that because of safety concerns and as a way to get Mr. Saine to stop running, he pretended a police canine had arrived and yelled, "You're going to get bit boy … get the dog out, get the dog out!" (Joint Ex. 49 at 16:13-16:23; Joint Ex. 11 at 6:14-6:15.)  Sergeant Kelly testified that the ruse worked, and that Mr. Saine stopped, gave up, and lay down.  (Joint Ex. 49 at 17:2-17:3; *see also* Joint Ex. 11 at 6:25-6:30.)  Sergeant Kelly testified that based Victim B's report of a gun, the officers handcuffed Mr. Saine and subjected him to a *Terry* frisk.  (Joint Ex. 49 at 17:3-17:6; *see also* Joint Ex. 11 at 6:35-6:40.)  Sergeant Kelly testified that he ultimately arrested Mr. Saine because Mr. Saine tried to flee police and he was concerned about public safety because he believed Mr. Saine was part of the attempted armed carjacking.  (Joint Ex. 49 at 18:6-19:14.)  Sergeant Kelly explained that once Mr. Saine was in custody, he departed to pursue the remaining suspects.  (Joint Ex. 49 at 19:21-20:9.)

Officer Lamandre Wright testified during the April 10, 2024 hearing that he witnessed Mr. Saine trying to run away from Sergeant Kelly, and that he detained Mr. Saine in his squad car after Sergeant Kelly arrested him for fleeing on foot.  (Joint Ex. 49 at 27:15-28:11.)  Officer Wright stated that he conducted a search incident to Mr. Saine's arrest and recovered, among other items, a cellular phone, a mask, a glove, and a fanny-pack containing another cellular phone, a window punch tool, and a screwdriver.  (*Id.* at 28:7-28:24.)  Officer Wright testified that, based on his training and experience, individuals may use a window punch tool to gain access to an occupied or unoccupied vehicle, and may use a screwdriver to enter or a start a vehicle, or to rip the steering wheel column off.  (*Id.* at 29:3-29:13.)

Photos taken after Mr. Saine's arrest show Mr. Saine as a tall, thin, Black male, who on October 6, 2023 appeared youthful, with short hair and no facial hair.  (Joint Ex. 14.)  The photos

depict Mr. Saine in a blue hooded sweatshirt and other dark clothing, including dark-colored pants and a dark-colored T-shirt under the sweatshirt. (*Id.*)

### D.    The Show-Ups

#### 1.    Victim A

Officer Wright testified that the show-up with Victim A took place at the Public Service Building ("PSB") because several of the alleged carjacking suspects were juveniles. (ECF No. 49 at 30:9-30:18.) He stated that the show-up at the PSB was "unusual" because it was typically a place officers took people to be interviewed and booked. (*Id.* at 31:8-31:14; 41:1-41:5.) Investigator Stephen McBride, who works in the Minneapolis Police Department Juvenile Unit, later explained that the PSB is not a jail or detention facility; rather, it houses various city departments and its garage is conducive to a show-up because it is well-lit. (*Id.* at 73:12-73:14; 74:14-74:20; 78:2-78:11.)

Investigator McBride testified that sometime after the juvenile suspects were detained on October 6, 2023, Officer Dalnes called to tell him about the incident involving Victim A in the Fifth Precinct on the chance it could be connected to the incident involving Victim B in the Third Precinct. (ECF No. 49 at 76:5-76:11.) Officer Dalnes's body-worn camera shows that during the call, she referred to it as a "stretch" for arrestees in the Third Precinct to have been part of the carjacking involving Victim A, but said she would bring Victim A to the PSB for the show-up. (Joint Ex. 2, Officer Dalnes's Body Worn Camera Footage- Full, at 1:17:36-1:20:02: 1:31:01-1:31:02.)

Investigator McBride testified that there was no exigency or special circumstances requiring a show-up, but that a show-up was the "best way" to identify who participated in the alleged crimes. (*Id.* at 80:2-80:11.) He testified that a show-up was preferable to a photo lineup

because a photo lineup would be done at a different time, but at a show-up the suspects were in their same clothing and their body size and type could be seen.  (*Id.* at 80:12-80:19.)

Officer Dalnes testified that she picked up Victim A from her granddaughter's home to transport her to the PSB for the show-up, approximately 20-25 minutes away.  (*Id.* at 125:4-125:8; 126:18-126:20.)  Victim A participated in the show-up starting around 7:50 p.m., almost three hours after the Doorbell Camera showed suspects taking her car.  (Joint Ex. 5, Squad Car Camera Footage- Back, at 0:15; *see also* Joint Ex. 20.)  Before the show-up began, an officer explained to Victim A, "We've got four suspects that might be related to the robbery that happened to you … we're going to ask if you can identify them, and if you can, if you could be specific about what they did …."  (Joint Ex. 5 at 0:15-0:37.)  Victim A stated she understood.  (*Id.* at 0:37-0:38.)  Victim A expressed anxiety about participating in the show-up.  (*See* Joint Ex. 6, Additional Squad Camera Footage-Back, At 0:40-1:00.)  She stated, "The problem is they have all my information" and "they know where I live."  (*Id.* at 0:40-0:52.)  An officer reassured her that she did not need to worry because the police did not find her personal information when they searched and arrested the suspects.  (*Id.* at  0:58-1:03.)

### a.    Ms. Brent

During the April 10, 2024 hearing, Ms. Brent informed the Court that her challenge to the show-up with Victim A was moot.  (ECF No. 49 at 9:17-10:4; *see also* ECF No. 38.)  The Court therefore does not address the show-up with Victim A is it pertains to Ms. Brent.

### b.    Mr. Saine

During the show-up at the PSB police presented several suspects to Victim A.  Prior to Mr. Saine's presentation in the show-up, Victim A stated that one of the other suspects presented was not the one who took her bag, because the one who took her bag "had shorter hair."  (Joint Ex. 5

at 2:36- 2:43.)  When an officer presented Mr. Saine—alone and in handcuffs—Victim A stated, "I think he's the one that grabbed my purse."  (*Id.* at 5:35-5:40; *see also* ECF No. 49 at 129:11-22.)  The officer asked, "He's the one that grabbed your purse?," and Victim A confirmed, "Yeah."  (ECF No. 5 at 5:40-5:42.)  The officer asked Mr. Saine to turn to his side, and Victim A repeated, "Yeah, Yeah, Yup."  (*Id.* at 5 5:45-5:50.)

> ### 2.    Victim B

Officer Martin asked Victim B if he was willing to "take a ride with [him] to go look at some people and tell us if we have the correct people in custody." (Joint Ex. 8 at 2:12-2:20.)  When Victim B consented, Officer Martin stated, "when we go to do this … honest answers … if it's not them, it's not them." (*Id.* at 2:20-2:28.)  Officer Martin then transported Victim B to the Walgreens parking lot to participate in a show-up.  (*Id.* at 5:40-7:02.)  While driving, he explained to Victim B, "We have some people in custody, I would like you to come and take a look, um, that's what we're doing, um, tell me if you recognize them, or if you don't recognize them, um, if you don't recognize them, obviously you don't know who they are, you don't know what's going on, if you do recognize them, tell me why you recognize them, and what part they played in this incident, okay?" (*Id.* at 6:14-6:33.)  Just before the show-up, Officer Martin asked Victim B how he noticed the people who tried to take his car were at Walgreens.  (*Id.* at 7:30-7:35.)  Victim B stated that after he called 911 about the attempted carjacking, he drove around the block and happened to see the group that attempted to carjack him still standing in the area.  (*Id.* at 7:35-7:58.)  He also recorded the group outside Walgreens on his cellular phone ("Cellular Phone Footage") (Joint Ex. 22).  Victim B informed Officer Martin that "the group was bigger when they went back to Walgreens." (*Id.* at 11:29-11:30.)  Officer Martin did not ask what the added group members were wearing but responded, "That's okay.  I just—all I want to know right now is who was involved

and if they were involved in what happened." (*Id.* at 11:30-11:37.)

The show-up began at around 6:47 p.m. (Joint Ex. 8 at 9:05.) Victim B sat in the back of Officer Martin's squad car with a cage partition separating him from the driver. (Joint Ex. 16, Officer Martin's Squad Car Footage-Back, at 0:00-0:15.) Officer Martin confirmed that Victim B had a clear view from the back seat where he was sitting. (Joint Ex. 8 at 9:05-9:10.) Multiple people participated in the show-up. Police officers presented the participants in the show-up approximately 30-40 feet from Officer Martin's squad car with the car's spotlight positioned on the participants. (*See* Joint Ex. 17, Officer Martin's Squad Car Footage-Front at 4:45-9:03.) Several police officers milled around during the show-up but no officer had any weapon drawn. (*Id.*)

### a.    Ms. Brent

An officer presented Ms. Brent to Victim B at around 6:51 p.m. (Joint Ex. 17, at 8:43-9:15.) Ms. Brent was in handcuffs. (*Id.*) Almost immediately upon seeing Ms. Brent, Victim B stated, "That's her. That's her." (*Id.* at 8:43.) An officer inquired, "You're saying that this person is the person with the gun?" (*Id.* at 8:49-8:51.) Victim B responded, "Yes. Correct." (*Id.* at 8:51-8:52.) Victim B continued, "I recognize her by the short top, she had a black jacket on earlier that was shiny." (*Id.* at 8:55-9:00.) An officer asked again, "She's the one you saw with the handgun?" (*Id.* at 9:09-9:11.) Victim B replied, "She's the one that touched my car, spoke to me, approached the car, and touched the gun to my car." (*Id.* at 9:11-9:15.)

### b.    Mr. Saine

An officer presented Mr. Saine to Victim B at around 6:50 p.m. (Joint Ex. 17, at 7:28-8:04.) Mr. Saine was in handcuffs. (*Id.*) As Mr. Saine approached, Officer Martin confirmed that Victim B could see clearly. (*Id.* at 7:34-7:36.) Officer Martin asked Victim B, "Do

you recognize this person?"  (*Id.* at 7:36.)  Victim B responded, "Yes."  (*Id.* at 7:37.)  Victim B

stated "[Mr. Saine] was in the blue hoodie, and he was potentially the one standing in the middle

of the street, but when they were all running together [from Walgreens] he was running with them."

(*Id.* at 7:40-7:50.)  Victim B stated, Mr. Saine was "possibly" and "potentially" the person standing

in the street behind his car during the attempted carjacking, but he could not confirm that for sure.

(*Id.* at 7:55-8:25; *see also* Joint Ex. 16 at 3:12-3:22.)  Victim B stated that what he recognized

about Mr. Saine was his "blue hoodie."  (Joint Ex. 17 8:25-8:28.)  Victim B's Cellular Phone

Footage shows more than one person wearing a blue hooded sweatshirt outside the Walgreens

store.  (*See* Joint Ex. 22 at 0:17-0:18.)

## DISCUSSION

### I.    Legal Standards

#### A.    Victim Identification

"The Supreme Court has recognized 'a due process check on the admission of eyewitness

identification, applicable when the police have arranged suggestive circumstances leading the

witness to identify a particular person as the perpetrator of a crime."  *United States v. Golden*, 418

F. Supp. 3d 416, 426 (D. Minn. 2019) (quoting *Perry v. New Hampshire*, 565 U.S. 228 (2012)).

To determine whether an out-of-court identification should be suppressed under the Due Process

Clause, the Court conducts a two-step inquiry: (1) first, the Court must first determine whether the

procedure was impermissibly suggestive; and (2) if it was, the Court must then "examine whether

under the totality of the circumstances the [procedure] created a substantial likelihood of

misidentification at trial."  *United States v. House*, 823 F.3d 482, 485-87 (8th Cir. 2016).

Under the second prong, even an impermissibly suggestive identification is admissible if

it is reliable.  *United States v. Pickar*, 616 F.3d 821, 827 (8th Cir. 2010) ("A crime victim's

identification of a defendant is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive *and* unreliable." (quoting *United States v. Martinez*, 462 F.3d 903, 901 (8th Cir. 2006) (emphasis in original)).

To assess reliability, the Court looks at "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *United States v. Williams*, 340 F.3d 563, 567 (8th Cir. 2003) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). Absent "special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." *Pickar*, 616 F.3d at 828. "[N]ecessary incidents of on-the-scene identifications, such as the suspect being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." *Martinez*, 462 F.3d at 911. Additionally, "the jury, not the judge, traditionally determines the reliability of evidence." *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) (holding due process did not require judicial inquiry into the reliability of eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances).

## B.    Suppression of Statements

The Fifth Amendment requires law enforcement officers to inform a person of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), before beginning a custodial interrogation. *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007); *see also United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) ("The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning.") *Miranda* warnings must be given whenever a suspect is interrogated while in custody. *Griffin*, 922 F.2d at 1347. But "[i]t is

well-settled that routine biographical data is exempt from Miranda's coverage ...." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996); *see also United States v. Armstrong,* 39 F.4th 1053, 1056 (8th Cir. 2022) (recognizing a "routine booking question" exception to *Miranda*). The Eighth Circuit defines "interrogation" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Armstrong*, 39 F.4th at 1056. A threat to public safety may also justify an exception to the *Miranda* rule. *See New York v. Quarles*, 467 U.S. 649, 657, (1984) (holding the "need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination").

Additionally, while the *Miranda* rule applies to responses to interrogatory questions, it does not apply to a "voluntary statement made by a suspect, not in response to interrogation … with or without the giving of *Miranda* warnings." *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (quotation omitted). Requests for clarification of a detainee's spontaneous statements generally do not constitute interrogation. *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005).

### C.    Warrantless Search

#### 1.    Investigatory Stop

"A warrantless search is presumptively unreasonable absent some exception to the warrant requirement." *United States v. Ringland*, 966 F.3d 731, 735 (8th Cir. 2020) (quotation omitted). One exception is that "[p]olice officers may briefly detain a person if they have a reasonable articulable suspicion that criminal activity is afoot" though "a mere hunch will not suffice." *United States v. Pope*, 910 F.3d 413, 414 (8th Cir. 2018) (citing *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012)). Such investigatory stops are often called *Terry* stops, after the namesake case *Terry v. Ohio*,

392 U.S. 1 (1968). Courts consider the "'the totality of the circumstances' when determining whether reasonable suspicion supported an officer's stop." *Pope*, 910 F.3d at 414 (quoting *Cotter*, 701 F.3d at 547). A limited protective search for weapons during a *Terry* stop is permissible if the subject might be armed. The purpose of this limited search is "to allow the officer to pursue his investigation without fear of violence, … thus the frisk for weapons might be equally necessary and reasonable[.]" *Adams v. Williams*, 407 U.S. 143, 146 (1972); *see also United States v. Horton*, 611 F.3d 936, 940-41 (8th Cir. 2010) ("[T]he officer does not need to be certain the suspect was armed" to justify a pat-down; rather, it is permissible so long as a "'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'") (quoting *Terry*, 392 U.S. 1 at 27).

### 2. Probable Cause

"The Supreme Court has interpreted the Constitution to permit reasonable seizures of persons [for] … a warrantless arrest based on the officer's determination of probable cause, such as a suspect who commits a crime in the officer's presence[.]" *Furlow v. Belmar*, 52 F.4th 393, 401 (8th Cir. 2022) (citing *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). To determine whether probable cause exists, courts "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 583 U.S. at 57 (quotations and citations omitted). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213 at 232 (1983)). "Probable cause is not a high bar." *Id.* (quotation omitted).

15

### 3.      Exclusionary Rule

Evidence cannot be used against the subject of an illegal search or seizure conducted in violation of the Fourth Amendment.  *See, e.g.*, *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011).  "Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality."  *United States v. Simpson*, 439 F.3d 490, 493–94 (8th Cir. 2006) (quoting *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir.1987), citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).  "[E]vidence should be excluded, however, only if the illegality is at least a but-for cause of obtaining the evidence."  *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012) (internal quotation marks and citation omitted); *accord United States v. Miller*, 11 F.4th 944, 954 (8th Cir. 2021); *Riesselman*, 646 F.3d at 1078.  "The controlling question is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  *United States v. Yousif*, 308 F.3d 820, 829 (8th Cir. 2002) (quoting *Wong Sun*, 371 U.S. at 488 (1963)).

### III.    Ms. Brent's Motions

Ms. Brent filed two motions: (1) Motion to Suppress Statements (ECF No. 37); and (2) Motion to Suppress Witness Identifications (ECF No. 38).

### A.      Motion to Suppress Statements

Ms. Brent asks the Court to suppress whatever statements she made in the back of Officer Gerten's squad car but does not identify any specific statement she seeks to suppress.  (ECF No. 58 at 5-8.)  She argues generally that her statements should be suppressed under the Fifth Amendment because they resulted from a custodial interrogation without a proper *Miranda* warning.  (*Id.*)

There is no dispute that Ms. Brent was in custody at the time of her contested statements, and that officers did not provide her a *Miranda* warning. (Joint Ex. 18 at 1:42-1:44, both Officer Gerten and his partner informing Ms. Brent she was under arrest without providing her a *Miranda* warning.) While she was in the back of the squad car, one of the officers asked her, "So who had the gun?" (*Id.* at 2:55-2:56.) Ms. Brent responded that it was someone else's gun and proceeded to make number of statements about the roles others played during the incident involving Victim B. (Joint Ex. 19 at 0:30-1:30.)

The Court cannot clearly identify all of the statements she made—and declines to speculate exactly which ones Ms. Brent contests—but finds no basis to suppress anything she may have said. First, the statement she made in response to the officer's question, "So who had the gun?" is admissible under the public safety exception to the *Miranda* rule. *Quarles*, 467 U.S. at 657 (applying public safety exception to officers' question regarding the location of a gun during suspect's apprehension). When Officer Gerten and his partner arrested Ms. Brent, they and other police officers were in the midst of responding to a carjacking that involved multiple suspects and at least one firearm. Officer Gerten testified that, given the nature of the alleged offense, he and his partner were concerned about public safety. (Joint Ex. 49 at 53:21-54:3.) Because it was not clear whether the threat had been contained or whether a potential shooter with another weapon remained at large, the officer's narrowly tailored question regarding "who had the gun" was appropriate. The threat to public safety in this context outweighed any right Ms. Brent had against self-incrimination. *Quarles*, 467 U.S. at 657. As for any other statements Ms. Brent made, the record does not reflect that she made them in response to any specific question. (*See* Joint Ex. 19 at 0:30-1:30.) The Eighth Circuit has "repeatedly held," a "voluntary statement made by a suspect, not in response to interrogation, is not barred and is admissible with or without the giving of

*Miranda* warnings." *Turner*, 157 F.3d at 556.  For these reasons, the Court recommends that Ms. Brent's Motion to Suppress Statements (ECF No. 37) be denied.

### B.    Motion to Suppress Witness Identifications

Ms. Brent argues the Court must suppress Victim B's identification of her because it resulted from an impermissibly suggestive show-up and creates a substantial likelihood of misidentification at trial.  (ECF No. 58 at 8-13.)  She contends the show-up was impermissibly suggestive based on: (1) her appearance—including that she was handcuffed and surrounded by police officers—and she had unique identifying features as "the only tall, brown-skin female with the group of arrestees who was wearing a crop top"  (*Id.*  at 9-10); (2) the location of the show-up in the Walgreens parking lot where Victim B earlier reported seeing the group of juveniles who tried to take his car (*id.* at 10); and (3) a lack of exigency calling for immediate confrontation when Ms. Brent had already been under arrest for some time and there was no evidence Victim B could not participate in a lineup or photo array identification procedure at a later time (*id.*  at 10-11).

Ms. Brent argues the show-up created a substantial likelihood of misidentification at trial because: (1) Victim B's opportunity to view Ms. Brent was limited by the quickness of the encounter; (2) his degree of attention was tainted when he had an "undisclosed amount of time to stare at the group of kids at Walgreens to try pick out who within that group may have tried to take his car" (*id.* at 11-12); (3) the accuracy of Victim B's initial description of Ms. Brent was questionable since Officer Martin failed to ask him clarifying questions about exactly what he saw; and (4) law enforcement created an environment designed to increase Victim B's certainty that he correctly identified Ms. Brent.  (*Id*. at 12-13.)  Ms. Brent's arguments are unavailing.

Although Ms. Brent was handcuffed and surrounded by police officers with a squad car's spotlight pointed at her during the show-up with Victim B (Joint Ex. 17, at 8:43-9:15), the Eighth

Circuit has repeatedly held that similar show-ups were not impermissibly suggestive. *See, e.g.*, *Pickar*, 616 F.3d at 824-828 (finding show-up procedure involving defendant handcuffed outside marked squad car and standing between two police officers not impermissibly suggestive); *Martinez*, 462 F.3d at 911 (rejecting claim of suggestiveness when defendant was handcuffed, had been driven to the crime scene in a police car, and police officers were present); *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998) (finding show-up not suggestive when "uniformed police officers lined up four handcuffed suspects thirty-five to forty-five feet from the [stolen] car"). The Court therefore cannot conclude that the circumstances of Victim B's show-up with Ms. Brent were impermissibly suggestive. "[N]ecessary incidents of on-the-scene identifications, such as the suspect being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." *Martinez,* 462 F.3d 903, 911 (8th Cir. 2006).

The Court similarly cannot conclude that law enforcement engaged in any unconstitutionally suggestive conduct. Rather, Officer Martin emphasized to Victim B before the show-up that he only wanted "honest answers" and that "if it's not them, it's not them" (Joint Ex. 8 at 2:20-2:28). He also reiterated to Victim B that he wanted to know if law enforcement had the "correct" people in custody. (*Id.* at 2:12-2:20.) Officer Martin also told Victim B  "we have some people in custody, I would like you to come and take a look, that's what we're doing, tell me if you recognize them, or if you don't recognize them, if you don't recognize them, obviously you don't know who they are, you don't know what's going on, if you do recognize them, tell me why you recognize them, and what part they played in this incident, okay?" (*Id.* at 6:10- 6:33.) The record does not reflect that Officer Martin or any other law enforcement agent improperly influenced or pressured Victim B to positively identify Ms. Brent or any other participant it the show-up as a person involved in the attempt to take his car. Indeed, Victim B firmly stated that he

did not recognize one of the individuals who participated in the show-up, demonstrating he did not feel unduly pressured to positively identify participants. (*Id.* at 10:58-11:10.)  For these reasons, the Court finds nothing about the show-up was impermissibly suggestive.

The Court also finds Victim B's identification of Ms. Brent was reliable.  Although the encounter was brief, Victim B had ample opportunity to view the female who pointed a gun at him directly outside his car window, and the description he first provided in his 911-call closely matches Ms. Brent's appearance during the show-up. (*See* Joint Ex. 21 at 1, reporting Black female suspect, 15-18 years old, in a black puffy jacket, crop top, and pants; *see also* Joint Ex. 17 at 8:43-9:15, camera footage from show-up closely resembling Victim B's initial description.) Victim B was certain of her identity even though she was no longer wearing a jacket, stating "I recognize her by the short top, she had a black jacket on earlier that was shiny." (*Id.* at 8:55-9:00.) Although Ms. Brent was not wearing a jacket during the show-up, a police officer recovered one near where Ms. Brent was detained, thus corroborating Victim B's statements.  (Joint Ex. 18 at 1:15-1:21.)  Ms. Brent makes much of the fact that Victim B had an undisclosed amount of time to observe the people who attempted to take his car at Walgreens (ECF No. 58 at 11-12), but the record reflects that he encountered the group only after calling 911 and providing the initial description that later matched Ms. Brent's appearance during the show-up.  (Joint Ex. 8 at 7:30-7:35.)  Ms. Brent also contests the reliability of Victim B's identification because Officer Martin did not ask certain clarifying questions about what Victim B saw.  (ECF No. 58 at 12-13.) But Victim B provided a detailed description to 911 moments after the attempted carjacking, which matched Ms. Brent's appearance during the show-up and was corroborated the jacket found during her apprehension.  Whether or not Officer Martin asked clarifying questions does not alter this fact.

Victim B also expressed a high level of certainly he would be able to identify the female who pointed a gun at him (Joint Ex. 8 at 1:50-2:05, stating he would "for sure" be able to identify the female who pointed a gun at him), and subsequently identified Ms. Brent as that female almost immediately upon seeing her in the show-up (Joint Ex. 18 at 8:43, stating "That's her.  That's her.").  When an officer asked Victim B to confirm Ms. Brent was the female who pointed a gun at him (*id.* at 9:09-9:11), Victim B replied, "She's the one that touched my car, spoke to me, approached the car, and touched the gun to my car."  (*Id.* at 9:11-9:15.)  Victim B's opportunity to view the female who pointed a gun at him, the detailed description he provided immediately after the event closely matching Ms. Brent's appearance at the show-up, and his level of certainty all support reliability.  *Williams*, 340 F.3d at 567.

The record reflects that Victim B gave his first statements to the 911 dispatcher moments after the alleged attempted carjacking at around 6:20 pm on October 6, 2023 (*see* Joint Ex. 21; *see also* ECF No. 49 at 61), while the show-up with Ms. Brent occurred at around 6:51 p.m.— just over thirty minutes after Victim B's initial report.  The relatively brief period of time between the alleged crime and the show-up therefore also supports reliability.  *Williams*, 340 F.3d at 567.  Any remaining question about the strength of Victim B's identification of Ms. Brent is properly left for the jury.  *Perry*, 565 U.S. 228 at 245.  For these reasons, the Court recommends Ms. Brent's Motion to Suppress Witness Identifications (ECF No. 38) be denied.

## IV.    Mr. Saine's Motions

Mr. Saine also filed two motions: (1) Motion to Suppress Impermissibly Suggestive and Unreliable Identification (ECF No. 34); and (2) Motion for Suppression of Evidence as a Result of Illegal Search and Seizure (ECF No. 35).

A.    **Motion to Suppress Impermissibly Suggestive and Unreliable Identification**

Mr. Saine challenges the admissibly of the show-ups with both Victim A and Victim B on the grounds that each was inherently suggestive and unreliable.  (ECF No. at 6-16; *see also* ECF No. 62 at 2-10.)  He contends that officers could have conducted a double-blind sequential line-up to ensure the integrity of the Victims' identifications of Mr. Saine but chose instead to subject him to inherently suggestive and unreliable one-person show-up identifications.  (ECF No. 62 at 2-3.)

1.    **Victim A**

a.    **Suggestiveness**

Mr. Saine argues the show-up with Victim A was impermissibly suggestive because: (1) it was neither prompt nor at the scene of the alleged offense; (2) the environment was unnecessarily coercive when Mr. Saine was "paraded in front of the complaining witness in handcuffs" while surrounded by police officers in a municipal building where individuals are typically booked following arrest; (3) there was no exigency or apparent reasons for the show-up in lieu of a double-blind sequential line-up when Mr. Saine was already in custody; and (4) an officer told Victim A that police did not find her personal information when they arrested and searched the suspects she was about to see in the show-up.  (ECF No. 56 at 8-11; ECF No. 62 at 4-7.)

Based on the above-cited binding precedent, there is nothing impermissibly suggestive about law enforcement presenting Mr. Saine to Victim A alone, wearing handcuffs, and surrounded by police officers.  *Pickar*, 616 F.3d at 824-828, *Martinez*, 462 F.3d at 911, *King*, 148 F.3d at 970.  And while the show-up did not take place immediately at the crime scene, that was because the link between the suspects and Victim A's carjacking was discovered only after the suspects had already been transported to the PSB.  (ECF No. 49 at 76:5-76:11.)  Officer Wright testified that it was unusual to conduct a show-up in the PSB (ECF No. 49 at 31:8-31:14; 41:1-41:5)

and Investigator McBride testified that there was no exigency or special circumstances requiring a show-up, but he also explained that a show-up was the "best way" to identify who was involved in the alleged crimes (*id.* at 80:2-80:11), in part because it allowed the victim to see each suspect's clothing, body size and type close to the time of the offense, and a photo line-up could always be conducted at a later time (*id.* at 80:12-80:19). The Court therefore cannot conclude there was anything inherently improper or impermissibly suggestive about when or where the show-up took place.

Mr. Saine contends police "egregiously violated Mr. Sane's rights" when one of the officers reassured Victim A they had not found her personal information when they arrested and searched the individuals to be presented at the show-up. (ECF No. 62; *see* 0:58-1:03.) According to Mr. Sane, "This not only implied that her identification was crucial for their arrest but also subtly suggested that her safety might depend on their incarceration." (*Id.*) The Court disagrees. If anything, the fact that police did not find any of Victim A's personal information on the suspects at the time of their arrest suggested to Victim A that they might not have been involved in her carjacking, and in any event, her safety did not depend on the identification because they did not know who she was or where she lived. Additionally, though the officer's statement informed Victim A that police officers had already arrested and searched the suspects she was about to see, an officer previously explained that the suspects might not be related to her carjacking. He stated, "We've got four suspects that might be related to the robbery that happened to you … we're going to ask if you can identify them, and if you can, if you could be specific about what they did … ." (*Id.*) Finally, Victim A demonstrated she did not feel unduly pressured to positively identify participants in the show-up when she stated that one of the other suspects presented was *not* the one who took her bag. (Joint Ex. 5 at 2:36- 2:43.) The Court thus cannot conclude that police

officers improperly influenced or persuaded Victim A to identify Mr. Saine or that the show-up was impermissibly suggestive.

### b.    Reliability

Mr. Saine argues Victim A's identification of him was also unreliable because: (1) Victim A did not get a good view of the male suspect; (2) her ability to pay attention to details after she saw a gun was impaired; (3) prior to the show-up, Victim A said she could not describe any suspect with certainty and did not describe any suspect wearing a blue sweatshirt; and (4) she did not identify Mr. Saine with certainty during the show-up. (ECF No. 56 at 12-16; *see also* ECF No. 62 at 4-6.)

The Court need not find Victim A's identification of Mr. Sane reliable because it has found the circumstances of that identification were not impermissibly coercive or suggestive. *See Perry*, 565 U.S. at 245. Furthermore, based on the totality of the circumstances, and noting Mr. Saine's objections, the Court finds Victim A's identification sufficiently reliable to allow the jury to consider it. Victim A had an uninhibited opportunity to observe the suspects walking down the street before they confronted her, and she saw them again in close proximity when they approached her, knocked her down, and took her vehicle. (*See, e.g.*, Joint Ex. 20; *see also*, Joint Ex. 3 at 0:00-0:40, Victim A describing initial encounter with suspects at stoplight; *id.* at 1:15-1:35, describing the group continuing to walk towards her; *id.* at 3:00-3:21, describing a male who took her bags and knocked her down.) Victim A also provided a detailed description to Officer Dalnes within an hour after the attempted carjacking that closely matched Mr. Saine. (*See* Joint Ex. 3 at 8:25-9:35.) Although Victim A expressed uncertainty, and did not specifically mention a blue sweatshirt, Victim A told Officer Dalnes that the male who took her purse was thin, tall, with dark complexion, short hair, no facial hair, dressed in dark clothing, and approximately 16 years old.

24

(*Id*. at 8:25-9:35.)  The record reflects that at the time of his arrest, Mr. Saine was wearing dark clothing, including dark-colored pants and a dark-colored T-shirt under his sweatshirt.  (Joint Ex. 14.)  He was also tall, thin, dark complexioned, had short hair and no facial hair, and appeared to be very youthful.  (*Id.*)  When an officer presented Mr. Saine during the show-up approximately two and a half hours after the carjacking, Victim A initially appeared to be uncertain, stating, "I think he's the one that grabbed my purse."  (Joint Ex. 5 at 5:35-5:40; *see also* ECF No. 49 at 129:11-22.)  But she confirmed it on further questioning and demonstrated confidence in her identification when given an opportunity to see Mr. Saine from the side.  The officer asked, "He's the one that grabbed your purse?", and Victim A confirmed, "Yeah."  (ECF No. 5 at 5:40-5:42.) Then the officer asked Mr. Saine to turn to his side, and Victim A repeated, "Yeah, Yeah, Yup." (*Id.* at 5 5:45-5:50.)

Based on this record, the Court concludes that Victim A's identification of Mr. Saine was sufficiently reliable.  *Williams*, 340 F.3d at 567.  Any remaining question about the reliability of Victim A's identification is properly left to the jury.  *Perry v. New Hampshire*, 565 U.S. 228 at 245. Accordingly, the Court recommends that Victim A's identification of Mr. Saine be found admissible.

### 2.    Victim B

#### a.    Suggestiveness

Mr. Saine argues the show-up with Victim B was impermissibly suggestive because an officer escorted him to the show-up while he was handcuffed, Victim B identified him from the back of a squad car, the squad car's spotlight focused directly on him, and several other officers milled around during Victim B's identification.  (ECF No. 56 at 6; *see also* Joint Ex. 17 at 7:28-8:04, camera footage supporting Mr. Saine's description of the show-up with Victim B.)  He

also notes that the show-up did not include the entire group whom Victim B observed at Walgreens, and while several members of that group wore blue hooded sweatshirts, Mr. Saine was the only one police arrested and subjected to the show-up.  (ECF No. 56 at 6-7; ECF No. 62 at 2-3.) Mr. Saine further points out that Victim B only said Mr. Saine "potentially" could be the person who stood behind Victim B's car during the attempted carjacking, and while he said Mr. Saine "was with" the kids at Walgreens, Victim B did not state that Mr. Saine did anything "except stand in the street."  (ECF No. 56 at 6-7; *see also* Joint Ex. 17 at 7:36-8:28, camera footage supporting Mr. Saines description of Victim B's identification; *see also* Joint Ex. 22 at 0:17-0:18, Cellular Phone Footage showing more than one person wearing a blue hooded sweatshirt outside the Walgreens store.)

The same reasoning largely applies to Mr. Saine's challenge to Victim B's identification as to Ms. Brent's.  Binding precedent requires a finding that the show-up with Victim B was not impermissibly suggestive solely because a police officer presented Mr. Saine to Victim B in handcuffs, surrounded by other officers, with a squad car's spotlight pointed at him.  *Pickar*, 616 F.3d at 824-828, *Martinez*, 462 F.3d at 911, *King*, 148 F.3d at 970.  And as discussed above, the record does not reflect that any police officer improperly influenced or pressured Victim B to identify Mr. Saine.  On the contrary, police encouraged Victim B to respond honestly and to inform law enforcement as to whether the correct people were in custody.  (Joint Ex. 8 at 2:12-2:28, 6:10-6:33.)  That Mr. Saine was the only person wearing a blue hooded sweatshirt who was subjected to the show-up despite the Cellular Phone Footage showing more than one person wearing a blue hooded sweatshirt outside the Walgreens store (*see* Joint Ex. 22 at 0:17-0:18), and that Victim B's identification of Mr. Saine was inconclusive, speaks more to the reliability of Victim B's identification than its suggestiveness. The record before the Court does not support a

finding that Victim B's identification of Mr. Saine was tainted by improperly suggestive or coercive police conduct.

### b.    Reliability

Mr. Saine argues Victim B's identification of him was unreliable because: (1) the incident happened quickly, so Victim B did not get a good look at the suspects; (2) Victim B's ability to pay attention to detail was impaired because he was shaken up; (3) Officer Gerten did not ask Victim B to describe anyone involved in the attempted carjacking prior to the show-up and Victim B volunteered only his description of a young woman; (4) Victim B said he identified Mr. Saine because Mr. Saine was wearing a blue sweatshirt, but Mr. Saine was not the only individual wearing a blue sweatshirt; (5) Victim B did not identify Mr. Saine with certainty; and (6) Victim  B stated only that the person wearing a blue shirt stood in a driveway.  (ECF No. 56 at 12-16; *see also* ECF No. 62 at 4-6.)

For the above-stated reasons, the Court need not find Victim B's identification of Mr. Sane reliable because it was not impermissibly suggestive.  *See Perry*, 565 U.S. at 245.  Furthermore, though Victim B's opportunity to view the individuals who attempted to take his car may have been brief, it was not insufficient for Victim B to gather information about the suspects' appearance.  In his 911call, Victim B described one of the suspects as a Black male in a blue hooded sweatshirt.  (Joint Ex. 21 at 1.)  During the show-up, just thirty minutes after the attempted carjacking, Victim B identified Mr. Saine based on the blue hooded sweatshirt he was wearing.  (Joint Ex. 17 8:25-8:28.)  He explained, "[Mr. Saine] was in the blue hoodie, and he was potentially the one standing in the middle of the street, but when they were all running together [from Walgreens] he was running with them."  (*Id.* at 7:40-7:50.)  Victim B also stated, Mr. Saine was "possibly" and "potentially" the person standing in the street behind his car during the attempted

carjacking, but he could not confirm that for sure. (*Id.* at 7:55-8:25; *see also* Joint Ex. 16 at 3:12-3:22). Victim B's close proximity to the suspects, the short amount of time between the alleged carjacking and the show-up, and Victim B's reasonable assuredness that Mr. Saine was the person he saw in the blue hooded sweatshirt who was part of the group that attempted to take his car all support reliability. *Williams*, 340 F.3d at 567. To the extent Mr. Saine questions the reliability of Victim B's identification on the grounds that other individuals wearing blue hooded sweatshirts also were present, or that Victim B did not actually observe the person in the blue hooded sweatshirt commit a crime, these are questions more appropriately left to a jury. *Perry*, 565 U.S. 228 at 245. For all the foregoing reasons, the Court recommends that Mr. Saine's Motion to Suppress Impermissibly Suggestive and Unreliable Identification (ECF No. 34) be denied.

**B.    Motion for Suppression of Evidence as a Result of Illegal Search and Seizure**

Finally, Mr. Saine argues he was seized in violation of his Fourth Amendment rights, and therefore, the items found on his person and the show-up with Victim A should be suppressed as fruits of the poisonous tree. (ECF No. 56 at 16-19; *see also* ECF No. 62 at 10.) Mr. Saine contends there was no reasonable basis for a *Terry* stop when police had not received a report that any male had a gun, and the sole reported firearm had already been recovered by the time Sergeant Kelly searched him. (ECF No. 56 at 17-18.) Mr. Saine further argues there is conflicting testimony about whether his search stemmed from a *Terry* stop or was a search incident to arrest for fleeing a police officer. (ECF No. 56 at 18.) He points out that he was not arrested for fleeing the police, but for aggravated robbery after the show-up with Victim B. (*Id.*) Mr. Saine argues that whatever

the basis for his detention, he was impermissibly detained and should not have been searched.  (*Id.* at 18-19.)

The Court finds law enforcement had both reasonable suspicion to conduct a *Terry* stop and probable cause to detain Mr. Saine.  Sergeant Kelly testified that while he was enroute to respond to the incident involving Victim B, he heard on his radio that a Black male suspect was running towards Chicago Avenue, and almost immediately after that he saw Black male matching Victim B's description of the suspect—Mr. Saine—running towards him.  (ECF No. 49  at 15:22-16:4; *see also* Joint Ex. 11 at 6:05-6:10.)  Sergeant Kelly stated that Mr. Saine looked at him, took off running, and continued to flee after Sergeant Kelly told him to stop.  (Joint Ex. 49 at 16:2-16:4, 16:5-16:8; *see also* Ex. 11 at 6:11-6:16.)  Sergeant Kelly further testified that when Mr. Saine finally stopped after Sergeant Kelly threatened to release a police dog, Sergeant Kelly subjected Mr. Saine to a *Terry* frisk because Victim B had reported the attempted carjacking involved a firearm.  (Joint Ex. 49 at 16:13-16:23, 17:2-17:6; Joint Ex. 11 at 6:14-6:15; 6:25-6:40.)  Sergeant Kelly said he ultimately arrested Mr. Saine because Mr. Saine tried to flee police, and Sergeant Kelly was concerned about public safety because he believed Mr. Saine was part of the attempted armed carjacking.  (Joint Ex. 49 at 18:6-19:11.)  Officer Wright conducted the search of Mr. Saine incident to his arrest and recovered, among other items, a cellular phone, a mask, a glove, and a fanny pack packing containing another cellular phone, a window punch tool, and a screwdriver.  (*Id.* at 28:7-28:24.)

Based on the totality of the circumstances, the Court finds there was reasonable suspicion to detain Mr. Saine and conduct a limited protective search because: (1) Mr. Saine was in the immediate vicinity of a crime allegedly involving a firearm; (2) his appearance matched the description Victim B reported to 911; and (3) he ran from Sergeant Kelly.  (*See* Joint Ex. 21; *see*

*also* Joint Ex. 11 at 6:05-6:10.) Even though Victim B reported seeing just one firearm, it was not unreasonable to search Mr. Saine on the chance that he, too, was armed. *Horton*, 611 F.3d 936 at 940-41.

Additionally, Mr. Saine's attempt to flee Sergeant Kelly was a crime under Minnesota law. *See* Minn. Stat. § 609.487 Subd. 6. Both Sergeant Kelly and Officer Wright testified that they had probable cause to detain Mr. Saine for fleeing the police, and the record supports that testimony. (Joint Ex. 49 at 18:6-19:14; 28:7-28:11.) Mr. Saine does not contest the government's contention that he ran when he saw Sergeant Kelly and continued running after Sergeant Kelly told him to stop. Because Mr. Saine was lawfully detained—both for a *Terry* stop and fleeing the police—in connection with their investigation of an attempted armed carjacking, the search of his person for possible dangerous weapons was not improper. *See Terry*, 392 U.S. at 27 (officer conducting a *Terry* search need not be certain individual is armed; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"). The Court recommends that Mr. Saine's Motion for Suppression of Evidence as a Result of Illegal Search and Seizure (ECF No. 35) be denied on these grounds.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Defendant Isis Martinaz Brent's Motion to Suppress Statements (ECF No. [37]) be **DENIED**;

2.    Defendant Isis Martinaz Brent's Motion to Suppress Witness Identifications (ECF No. [38]) be **DENIED**;

3.      Defendant Carvon Antonio Saine's Motion to Suppress Impermissibly Suggestive and Unreliable Identification (ECF No. [34]) be **DENIED**; and

4.      Defendant Carvon Antonio Saine's Motion for Suppression of Evidence as a Result of Illegal Search and Seizure (ECF No. [35]) be **DENIED**.


Dated: July 8, 2024                          *s/ Dulce J. Foster*
                                             DULCE J. FOSTER
                                             United States Magistrate Judge

## **NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).