**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

UNITED STATES OF AMERICA,

                              Criminal No. 23-374 (JRT/DJF)

                Plaintiff,

v.

                                **MEMORANDUM OPINION AND ORDER**

ISIS MARTINAZ BRENT and                 **ADOPTING REPORT AND**
CARVON ANTONIO SAINE,                    **RECOMMENDATION**

                Defendants.

---

David Green, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff.

James S. Becker and Success V. Carter, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for Defendant Isis Martinaz Brent.

Caroline Brunkow, **FORSGREN FISHER MCCALMONT DEMAREA TYSVER**, 225 South Sixth Street, Suite 1500, Minneapolis, MN 55402; Frederick J. Goetz, **GOETZ & ECKLAND PA**, 615 First Avenue Northeast, Suite 425, Minneapolis, MN 55413, for Defendant Carvon Antonio Saine.

Defendants Isis Martinaz Brent and Carvon Antonio Saine are charged with Aiding and Abetting Carjacking and Aiding and Abetting Brandishing a Firearm During a Crime of Violence stemming from an alleged carjacking spree. Brent moves to suppress statements she made during her arrest and a witness identification, and Saine moves to suppress two witness identifications and all evidence collected from his person during his arrest. Magistrate Judge Dulce J. Foster issued a Report and Recommendation ("R&R")

recommending that the Court deny the motions.  Brent and Saine timely objected to the

R&R.  Because the Court will affirm the R&R's conclusions under *de novo* and clear error

review, the Court will adopt the R&R, overrule Brent and Saine's objections, and deny

Brent and Saine's motions to suppress.

**BACKGROUND**

## I.   FACTS

The R&R comprehensively addresses the facts giving rise to this case, which neither

Brent nor Saine object to.  (*See* R. & R. at 1–12, July 8, 2024, Docket No. 63.)  Accordingly,

the Court will adopt the R&R's facts in full and briefly summarize those facts necessary to

rule on the matters pending before the Court.

Brent and Saine are each charged with Aiding and Abetting Carjacking in violation

of 18 U.S.C. §§ 2, 2119(1) and Aiding and Abetting Brandishing a Firearm in violation of

18 U.S.C. §§ 2, 924(c)(1)(A)(ii).  (Indictment at 1–2, Dec. 20, 2023, Docket No. 1.)  Both

defendants are currently detained pre-trial.  (Order of Detention at 3, Jan. 16, 2024,

Docket No. 23; Order of Detention at 2–3, Jan. 16, 2024, Docket No. 24.)  Their charges

stem from a carjacking spree on October 6, 2023 that involved different victims at two

locations in Minneapolis.  (Hr'g Tr. at 74:24–75:9, Apr. 29, 2024, Docket No. 49.)

### A.   The Incidents

#### 1.   Incident Involving Victim A

On October 6, 2023, Minneapolis Police Officer Melissa Dalnes responded to a 911

call reporting an alleged carjacking incident that involved Victim A, an elderly woman.  (*Id.*

at 122:7–9, 122:17–21.)  Victim A told Officer Dalnes that she had been approached by at least five young people after parking her car outside her granddaughter's home in south Minneapolis earlier that evening.  (Joint Ex. 3 at :00–:55, 1:13–1:37; Joint Ex. 20 (showing the suspects approaching Victim A around 5:15 p.m.).)  A young woman in the group asked for Victim A's car keys, and when Victim A hesitated, she brandished a blackish-gray gun out of a bag, pointed it at Victim A, and demanded that she give her the keys.  (Joint Ex. 3 at 1:38–1:53, 2:03–2:28.)  When Victim A complied, the woman pushed Victim A out of the way, opened the car door, and got inside.  (*Id.* at 2:50–3:00.)  Thereafter, other members of the group approached, and a young man asked for money and demanded Victim A's bags.  (*Id.* at 3:01–3:13.)  When Victim A did not comply, the man forcefully took the bags from Victim A, which caused her to fall.  (*Id.* at 3:14–3:20, 9:12–9:13.)

Victim A described to Officer Dalnes that the individuals in the group were African American.  (*Id.* at 6:55–7:05.)  She described the young woman who took her keys as having a "round face" with "kinda shortish" black hair pulled back with a teal headband, having an average build about 5.5 feet tall, and being approximately sixteen years old. (*Id.* at 6:40–6:53, 7:10–8:08.)  She described the young man who took her bag as being thin and tall, having short hair but no facial hair, wearing dark clothes, and under eighteen years old.  (*Id.* at 8:26–8:32, 8:44–8:56, 9:29–9:34.)  Victim A stated that she would likely recognize the woman if she saw her again, but "maybe not" the man.  (*Id.* at 9:35–9:45.)

### 2.      Incident Involving Victim B

About an hour after the first incident, Minneapolis Police officers responded to another call reporting an attempted carjacking involving Victim B.  (Joint Ex. 21; Hr'g Tr. at 91:3–13.)  Officer William Martin interviewed the victim.  (Hr'g Tr. at 91:15–19.)  Victim B told Officer Martin that he had been sitting in his car in a parking lot when a young woman knocked on his car window and demanded his keys.  (Joint Ex. 8 at 0:58–1:07.)  When Victim B did not comply, the woman tapped a charcoal-colored gun on the window, and Victim B quickly reversed his car to escape.  (*Id.* at 1:08–17, 2:00–2:06.)  On the 911 call, Victim B had described the woman as fifteen to eighteen years old and wearing a black puffy shiny jacket, crop top, and pants.  (Joint Ex. 21.)  He also told the 911 call receiver that the woman had been accompanied by two men, one of whom was wearing a "blue hoodie" and the other "light grey."  (Joint Ex. 8 at 1:18–1:50; *see also* Joint Ex. 21.)

Victim B later reported that, shortly after the incident, he drove around the block and spotted the juveniles among a slightly larger group of people standing outside a Walgreen's in the area.  (Joint Ex. 8 at 7:30–7:58.)  Victim B stated he would "for sure" be able to identify the woman who brandished the gun.  (*Id.* at 1:50–1:56.)

### B.      Detainment

### 1.      Brent

Officer Leonard Gerten testified that while he and his partner were on their way to respond to the incident involving Victim B, they heard on the radio that other officers were pursuing a group of juveniles on foot.  (Hr'g Tr. at 50:6–12.)  When the officers

observed a group of juveniles running across the street shortly thereafter, they joined in the pursuit. (*Id.* at 50:12–16.) Body-worn camera footage depicts Officer Gerten and his partner exiting their car to pursue a Black woman—later identified as Brent—and commanding her to get on the ground and put her hands behind her back. (Joint Ex. 18 at :00–:26.) Officer Gerten handcuffed Brent, and Brent implied that someone else gave her the gun officers found in her bag. (*Id.* at :30–:37, :55–:58, 1:45–2:09; *see also* Hr'g Tr. at 54:13–18.) The officers picked up Brent's bag as well as other scattered items, including a black shiny jacket, blue sweater, crocs, and a fanny pack. (Joint Ex. 18 at 1:07–1:19.) The officers told Brent she was under arrest and put her in the squad car, but neither provided a *Miranda* warning. (*Id.* at 1:38–1:45, 2:13–2:28.) Officer Gerten testified that the officers began to transport Brent to another location because they were concerned about public safety, given that Brent had been traveling with a group of other juveniles and the officers were unsure whether the others had been taken into custody. (Hr'g Tr. at 53:15–54:3.) After the officers received word that the police had "two more in custody," one of the officers asked Brent, "So who had the gun?" (Joint Ex. 18 at 2:46–2:56.) Brent replied that the gun was someone else's and explained that the other juveniles "were trying to steal a dude's car from a parking lot." (Joint Ex. 19 at 0:30–0:57, 1:08–1:15.)

### 2.      Saine

Sergeant Kelly testified that as he was on his way to respond to the incident involving Victim B, he heard on the radio that one of the Black male suspects was running towards Chicago Avenue.  (Hr'g Tr. at 12:12–13:8.)  Sergeant Kelly explained that when he observed a Black male wearing a blue top and dark-colored jeans—later identified as Saine—running toward Chicago Avenue, he pursued him on foot given his belief that Saine matched Victim B's description of one of the suspects who tried to carjack him.  (*Id.* at 15:22–16:4; *see also* Joint Ex. 11 at 6:05–6:14.)  When Saine refused to stop after Sergeant Kelly told him to, Sergeant Kelly pretended that a police canine had arrived and yelled that Saine would get bit if he did not stop running.  (Joint Ex. 11 at 6:10–6:22; *see also* Hr'g Tr. at 16:13–23.)  The ruse worked, and Saine got on the ground.  (Joint Ex. 11 at 6:23–6:25.)  Sergeant Kelly testified that the officers handcuffed Saine and subjected him to a *Terry* investigatory search based on Victim B's report of a gun at the incident and the dangerousness of attempted carjacking.  (Hr'g Tr. at 16:24–17:6, 18:13–19:6; *see also* Joint Ex. 11 at 6:35–6:40.)  The officers recovered, among other items, a cell phone, mask, glove, and a fanny-pack containing another cell phone, a window punch tool, and a screwdriver, which an officer explained are items typically used for carjacking.  (Hr'g Tr. at 28:16–24, 29:3–13.)

### C.    The Show-Ups

#### 1.    Victim A

After the juvenile suspects were detained, and because officers suspected that the incident involving Victim A could be connected to the incident involving Victim B, Victim

A was brought into the Public Service Building ("PSB") around 7:50 p.m. for a show-up, even though an officer testified that a show-up at the PSB was "unusual." (*Id.* at 30:9–18, 31:4–14, 41:1–5, 125:4–8, 126:18–21.) An investigator testified that a show-up was more preferable than a photo lineup because suspects in a show-up are still in their same clothing and victims are able to see their body size and type more clearly than in a photo. (*Id.* at 80:11–19.)

An officer explained to Victim A that she was going to be asked to identify whether any of the four suspects in the show-up might be related to her robbery and, if so, to provide specific details about what they did. (Joint Ex. 5 at :15–:37; Joint Ex. 7 at :30–1:04.) Victim A stated that she understood but that she was worried about participating in the show-up because the people who robbed her "have all my information" and "know where I live." (Joint Ex. 5 at :37–:38; Joint Ex. 6 at :40–1:00.) Officers reassured her that the police did not find her personal information when they searched and arrested the suspects. (Joint Ex. 6 at :50–1:00.)

After officers presented several suspects to Victim A, she stated that one of them was not the one who took her bag because the man who took her bag "had shorter hair." (Joint Ex. 5 at 2:36–2:43.) When Saine was later presented—alone and in handcuffs—Victim A identified Saine as the person who grabbed her purse. (*Id.* at 5:35–5:42; Hr'g Tr. at 129:11–22.) She repeated "Yeah, Yeah, Yup" when Saine turned to his side. (Joint Ex. 5 at 5:45–5:50.)

### 2. Victim B

Officers transported Victim B to the Walgreen's parking lot for the show-up around 6:47 p.m.  (Joint Ex. 8 at 5:40–7:02, 9:05.)  The officers explained that they had some people in custody and that Victim B was going to be asked to identify whether any of them might be related to his attempted carjacking.  (*Id.* at 6:14–6:33.)  Victim B sat in the back of the squad car and viewed the suspects through the window.  (Joint Ex. 16 at :00–:15.)  The suspects were 30-40 feet from the squad car and illuminated by the car's spotlight.  (Joint Ex. 17 at 4:45–9:07.)

Brent was in handcuffs during the show-up.  (*Id.* at 8:43–9:15.)  Almost immediately, Victim B identified Brent as the person who asked for his keys and touched the gun to his car.  (*Id.* at 8:43.)  He explained that he recognized her by the "short top" she was wearing, and that she had a shiny black jacket on earlier.  (*Id.* at 8:55–9:03.)

Saine was also in handcuffs during the show-up.  (*Id.* at 7:28–8:04.)  Victim B identified Saine as the person in the "blue hoodie" who was "possibly" and "potentially" the person standing in the street behind his car during the attempted carjacking, but that he was part of the group running from Walgreens.  (*Id.* at 7:40–8:25; Joint Ex. 16 at 3:10–3:37.)  Victim B had taken video footage from his cell phone before the juvenile suspects were detained, and the footage shows more than one person wearing a blue hooded sweatshirt outside the Walgreens.  (Joint Ex. 22 a :16–:18.)

## II.     PROCEDURAL HISTORY

Brent and Saine were indicted on December 20, 2023.  (*See generally* Indictment.)

Brent moved to suppress all statements she made to law enforcement at the time of her

arrest and both victims' eyewitness identifications.  (Mot. Suppress Statements at 2, Mar.

11, 2024, Docket No. 37; Mot. Suppress Witness Identifications at 3–4, Mar. 11, 2024,

Docket No. 38.)  Saine also moved to suppress the show-up identifications by both victims

as well as the evidence obtained during his arrest, arguing that he was illegally seized and

detained in violation of the Fourth Amendment.  (Mot. Suppress Impermissibly Suggestive

& Unreliable Identification at 5, Mar. 11, 2024, Docket No. 34; Mot. Suppress Evidence as

a Result of Illegal Seizure and Detention at 5, Mar. 11, 2024, Docket No. 35.)  The

Government opposes Brent's and Saine's motions.  (Gov.'s Resp., Mar. 25, 2024, Docket

No. 39; Gov.'s Resp., Mar. 25, 2024, Docket No. 40.)

The Magistrate Judge recommended that the Court deny Brent's and Saine's

motions to suppress.  (R. & R. at 30–31, July 8, 2024, Docket No. 63.)  Brent and Saine

timely objected to the R&R.  (Brent's Obj. to R. & R., July 22, 2024, Docket No. 64; Saine's

Obj. to R. & R., July 22, 2024, Docket No. 65.)

DISCUSSION

## I.     STANDARD OF REVIEW

After a magistrate judge files an R&R, a party may "serve and file specific written

objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2);

*accord* D. Minn. LR 72.2(b)(1).  "The objections should specify the portions of the

magistrate judge's report and recommendation to which objections are made and provide a basis for those objections." *Mayer v. Walvatne*, No. 07-1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008).  For dispositive motions, the Court reviews *de novo* a "properly objected to" portion of an R&R.  Fed. R. Civ. P. 72(b)(3); *accord* D. Minn. LR 72.2(b)(3).  "Objections which are not specific but merely repeat arguments presented to and considered by a magistrate judge are not entitled to *de novo* review, but rather are reviewed for clear error."  *Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015).  Because some objections were specific and others simply repeated arguments already presented to the Magistrate Judge, the Court will review the specific objections to the R&R *de novo* and the balance of the R&R for clear error.

## II.   BRENT'S MOTIONS

### A.   Motion to Suppress Statements

Brent first moves to suppress all statements she made to law enforcement while being transported by officers in the police car.  She never specifies any particular statements she wishes to suppress and instead moves to suppress the entire conversation she had with officers post-arrest.  Brent argues that her statements must be suppressed because they were obtained while she was in custody without proper warnings in violation of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  In the R&R, the Magistrate Judge first concluded that the statements Brent made to officers in response to the question "So who had the gun?" were admissible under the public safety exception to the *Miranda* rule because the question was meant to determine whether the threat

posed by the armed carjacking had been contained.  She then concluded that the balance of the conversation was admissible as voluntary statements not made in response to interrogation.

In her objections, Brent asks the Court to incorporate her original arguments that her statements should be suppressed and supplements with points of law related to the public safety exception.  To the extent that Brent asks the Court to incorporate arguments that were presented to and considered by the Magistrate Judge, the Court will review the R&R's findings for clear error.  *Montgomery*, 98 F. Supp. 3d at 1017.  However, the Court will review the public safety exception analysis *de novo* because Brent specifically objected to that portion of the R&R.  *Id.*

The Fifth Amendment requires law enforcement to provide certain warnings before interrogating a suspect who is in custody.  *Miranda*, 384 U.S. at 479; *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007).  Otherwise, incriminating statements obtained when a suspect is in custody and under a form of custodial interrogation may be excluded.  *Miranda*, 384 U.S. at 498–99.

It is undisputed that Brent was not offered a *Miranda* warning and that she was in custody for *Miranda* purposes.  *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009) ("An individual is in custody when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest.").  Brent objects, however, that the Magistrate Judge erred in concluding that Brent's statements need not be suppressed

because of the public safety exception to the *Miranda* rule or because the statements were not made in response to interrogation.  Specifically, Brent argues that the officer's question "So who had the gun?" was not made in response to ongoing public safety concerns.  In her view, the question concerned the gun that the officers had already retrieved from Brent's bag, so it was not made to elicit information regarding undiscovered guns that might have been involved in the incident that could have still posed a risk.

The public safety exception "permits a suspect's answer to a question to be admitted into evidence even if he had not first been informed of his *Miranda* rights so long as the purpose of the officer's question was to ensure public safety, not merely to elicit evidence."  *United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016); *see also New York v. Quarles*, 467 U.S. 649, 657 (1984) (recognizing the public safety exception).  Courts apply an objective standard in evaluating whether a question was made to ensure public safety.  *Jones*, 842 F.3d at 1082.

Brent's response to the officer's question, "So who had the gun?" is admissible under the public safety exception to the *Miranda* rule.  The officers were responding to an alleged carjacking spree that involved multiple suspects and at least one firearm.  The discovery of a gun from Brent's bag at the time of her arrest would lead an officer to have objectively reasonable concerns that other firearms may have been involved in the incident.  The public safety exception has applied when arresting officers asked the

-12-

suspect before searching his vehicle whether there was anything else in the car that they needed to know about that might hurt them.  *United States v. Liddell*, 517 F.3d 1007, 1008–10 (8th Cir. 2008); *see also United States v. Luker*, 395 F.3d 830, 831–32 (8th Cir. 2005) (applying the public safety exception under similar circumstances).  And "the danger posed by the possibility that other persons were present or might arrive during the event can support the application of the public safety exemption."  *United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008) (citing *United States v. Williams*, 181 F.3d 945, 953–54 (8th Cir. 1999)).  The question "So who had **the** gun?" could elicit information regarding whether the firearm currently in the officers' possession was the firearm used during the alleged carjacking, or whether another suspect had used a different firearm that was still undiscovered.  "So who had the gun?" was thus an objectively reasonable question meant to ascertain whether the public's safety was still at risk.

Additionally, the Magistrate Judge's recommendation that Brent's other statements are admissible was not clear error.  Brent's other statements are admissible as either responses to routine booking questions or statements made not in response to an interrogation; the record does not reflect that the officers were expressly asking Brent questions that were reasonably likely to elicit incriminating information.  *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) ("It is well-settled that routine biographical data is exempted from *Miranda*'s coverage."); *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) ("[A] voluntary statement made by a suspect, not in response to

interrogation, is not barred . . . and is admissible with or without the giving of *Miranda*

warnings." (citation omitted)).

Because Brent's statements in response to "So who had the gun?" are admissible

under the public safety exception and because the Magistrate Judge's recommendations

regarding Brent's other statements are not clearly erroneous, the Court will deny Brent's

motion to suppress statements.

### B.    Motion to Suppress Show-Up Identification

Brent also moves to suppress the show-up identification by Victim B as an

impermissibly suggestive and unreliable identification.[1]    The Magistrate Judge

determined that Victim B's eyewitness identification of Brent was admissible.   In her

objections, Brent makes no new arguments and instead reincorporates those arguments

denoted in her memorandum in support of her motion.   As a result, the Court will review

for clear error.  *Montgomery*, 98 F. Supp. 3d at 1017.

An out-of-court identification may be suppressed under the Due Process Clause if

it is "based upon a pretrial confrontation between the witness and the suspect that is

both 'impermissibly suggestive' *and* unreliable."  *United States v. King*, 148 F.3d 968, 970

(8th Cir. 1998) (citation omitted).   Brent argues that the show-up was impermissibly

suggestive because (1) she was handcuffed and surrounded by police officers, (2) the

---

[1] Brent also moved to suppress Victim A's eyewitness identifications, but she subsequently informed the Magistrate Judge that her challenge to Victim A's identification was moot.  (Mot. Suppress Witness Identifications at 3; Hr'g Tr. at 9:17–10:4.)

show-up occurred at the Walgreen's parking lot where Victim B had previously reported seeing the group of juveniles who tried to take his car, and (3) there was no indication that an immediate identification procedure was necessary or that Brent could not participate in a photo line-up or photo array identification at a later time.

The Magistrate Judge did not clearly err in concluding that Brent's challenged show-up with Victim B was not impermissibly suggestive. While "show-ups are inherently suggestive and ordinarily cannot be condoned when a line-up procedure is readily available," they are not automatically impermissibly suggestive. *United States v. Hadley*, 671 F.2d 1112, 1115 (8th Cir. 1982). Rather, "[t]he central questions are whether, in the 'totality of the circumstances,' the identification was reliable even though the procedure was suggestive, and whether there is a 'very substantial likelihood of irreparable misidentification.'" *Id.* (internal citations omitted). Show-ups where the suspect was handcuffed and surrounded by police officers, without more, are not impermissibly suggestive. *See, e.g.*, *United States v. Pickar*, 616 F.3d 821, 827–28 (8th Cir. 2010); *United States v. Martinez*, 462 F.3d 903, 910–11 (8th Cir. 2006); *King*, 148 F.3d at 970. Instead, whether the appearance of the suspect in handcuffs and surrounded by officers "cast[s] doubt on the accuracy of a positive identification is an issue for the jury." *King*, 148 F.3d at 970. Furthermore, police officers are not required to conduct photo line-ups or photo array identifications in lieu of show-ups, and the Eighth Circuit has approved such identifications under circumstances similar to this case. *See id.*; *see also Pickar*, 616 F.3d

at 827–28; *Martinez*, 462 F.3d at 911.  Indeed, show-ups "are essential to free innocent suspects and to inform the police if further investigation is necessary."  *King*, 148 F.3d at 970.  Nothing in the record indicates that the officers improperly pressured Victim B to identify Brent as the female suspect; instead, the record reflects that officers encouraged him to respond honestly.  Under all the circumstances, therefore, it was not clearly erroneous for the Magistrate Judge to conclude that Brent's show-up with Victim B was not impermissibly suggestive.

The Magistrate Judge also concluded that even if the show-up was impermissibly suggestive, it was reliable.  Brent claims that the show-up was unreliable because (1) the quickness of the encounter limited Victim B's opportunity to observe the female suspect, (2) Victim B's degree of attention was tainted when he had an undisclosed amount of time to observe the juveniles at the Walgreen's parking lot to discern who within the group had tried to take his car, (3) Officer Martin failed to ask Victim B to provide a description of the female suspect who approached his vehicle and tapped the gun to his car window, and (4) the officers improperly created an environment that prompted Victim B to identify Brent as the suspect.

An unreliable identification is one that "create[d] 'a very substantial likelihood of irreparable misidentification'" under the totality of the circumstances.  *Id.* (quoting *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996)); *see also United States v. House*, 823 F.3d 482, 485–86 (8th Cir. 2016).  Whether an identification was reliable

depends on factors such as "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Hadley*, 671 F.3d at 1115 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)).  Even though the alleged encounter was short, Victim B viewed Brent from just outside his car window, and he provided a description on the 911 call of a female suspect that later matched Brent's appearance.  Both Brent and the reported suspect were wearing a crop top and pants, and officers recovered a shiny black jacket near Brent when she was arrested, which corroborates Victim B's identification.  Additionally, Victim B expressed a strong level of certainty that he would "for sure" be able to identify the woman who tapped his car window with a gun, and he later identified Brent almost immediately after seeing her in the show-up.  The Eighth Circuit has held that such factors support reliability.  *United States v. Williams*, 340 F.3d 563, 567 (8th Cir. 2003).  It was therefore not clearly erroneous for the Magistrate Judge to find very little likelihood of misidentification when balancing the reliability factors.

Because the R&R's recommendation regarding the admissibility of Brent's show-up identification by Victim B was not clearly erroneous, the Court will deny Brent's motion to suppress the identification.

## III.    SAINE'S MOTIONS

### A.    Motion to Suppress Show-Up Identifications

Saine moves to suppress the show-up identifications of both Victim A and Victim B. The Magistrate Judge concluded that the victims' identifications of Saine were admissible because the show-ups were not impermissibly suggestive and were sufficiently reliable. (R. & R. at 22–28.) Saine objects to these conclusions, restating arguments previously considered by the Magistrate Judge. Saine's restated arguments are entitled to clear error review, but the Court would reach the same conclusion *de novo*. *Montgomery*, 98 F. Supp. 3d at 1017.

### 1.    Victim A

Saine first objects that the show-up with Victim A at the PSB was impermissibly suggestive because (1) it was not prompt nor at the scene of the alleged offense; (2) Victim A saw Saine handcuffed and surrounded by police officers in a building where individuals are customarily booked following arrest; (3) Victim A's identification of Saine as the suspect lacked certainty; (4) there were no exigent circumstances for having the show-up procedure at all, let alone at the PSB; and (5) the officers reassured Victim A that they did not find her personal information when they arrested the suspects, which Saine claims biased the identification.

The Magistrate Judge did not clearly err in concluding that the show-up identification with Victim A was not impermissibly suggestive. Nothing in the record indicates that the officers improperly pressured Victim A to identify Saine as the male suspect. Even though it was unusual to conduct a show-up at the PSB, the reason the

show-up did not take place immediately at the crime scene was because the possible connection between Victim A's and Victim B's incidents were not discovered until after the suspects had already been transported to the PSB.  Plus, the officers explained that show-ups can offer greater benefits for reliability than other identification procedures because the witnesses are able to view the suspect's body size and type shortly after the incident while the suspect is in the same clothes.  *See King*, 148 F.3d at 970 (noting other benefits of show-up procedures).  Furthermore, as the Court noted above, the fact that Saine was handcuffed and surrounded by police officers without more does not make the show-up impermissibly suggestive.  *See Pickar*, 616 F.3d at 827–28; *Martinez*, 462 F.3d at 911; *King*, 148 F.3d at 970.  Additionally, the officers' reassurance to Victim A that they did not find her personal information when arresting the suspects did not bias the identification because, as the Magistrate Judge explained, "[i]f anything, the fact that police did not find any of Victim A's personal information on the suspects at the time of their arrest suggested to Victim A that they might not have been involved in her carjacking."  Whether reviewing *de novo* or for clear error, the Court affirms the Magistrate Judge's determination that the show-up with Victim A was not impermissibly suggestive.

Turning next to evaluate the reliability of the show-up, the Court must balance multiple factors, including the witness's opportunity to view the suspect during the alleged crime, the witness's degree of attention, the degree to which the witness's prior

description matches the suspect, the witness's level of certainty at the identification, and the time lapse between the alleged crime and identification. *Hadley*, 671 F.3d at 1115. Saine argues that the show-up with Victim A was unreliable because (1) Victim A did not get a good view of the male suspect during the encounter, (2) Victim A was unable to pay adequate attention to the male suspect given the quickness of the encounter, (3) Victim A's description of the suspect before the show-ups was lacking, (4) Victim A failed to identify Saine with sufficient certainty, and (5) too much time elapsed between the alleged crime and the show-up.

The Magistrate Judge did not clearly err in determining that Saine's show-up with Victim A was sufficiently reliable for a jury to consider.  The record indicates that Victim A had sufficient time to get a good view of the male suspect when he approached her before the encounter and during the encounter when he demanded money and forcefully took her bags, knocking her down.  She also provided a description of the male suspect that closely matched Saine at the time of his arrest.  In particular, Saine and the male suspect were tall and thin, had short hair, had no facial hair, were wearing dark clothes, and were under eighteen.  Though Victim A did demonstrate some uncertainty in her identification of Saine at first, she demonstrated more confidence after viewing Saine from his side.  The Eighth Circuit has found that similar circumstances did not create a substantial likelihood of misidentification.  *See Pickar*, 616 F.3d at 828 (finding identification reliable where witnesses had "good opportunity" to view defendant,

provided earlier descriptions that generally matched defendant's appearance, clothing, age, and facial hair); *Martinez*, 462 F.3d at 911 (finding identification reliable where the victim had opportunity to clearly view the suspect, dealt directly with the suspect during the offense, and provided prior description of the suspect that generally matched defendant).  The Court concludes the same here.

### 2.    Victim B

Saine next objects that the show-up with Victim B was impermissibly suggestive. He argues the identification should be suppressed because (1) Victim B saw Saine removed from a squad car in handcuffs, illuminated by a squad car's bright lights, and surrounded by police officers; (2) Victim B's identification of Saine lacked sufficient certainty; and (3) Saine was the only suspect wearing a blue sweatshirt, even though multiple juveniles at the scene were wearing blue sweatshirts.

The Magistrate Judge did not clearly err in concluding that the show-up with Victim B was not impermissibly suggestive.  The fact that Victim B saw Saine handcuffed and surrounded by police officers does not, without more, mean that the show-up was impermissibly suggestive. *See Pickar*, 616 F.3d at 827–28; *Martinez*, 462 F.3d at 911; *King*, 148 F.3d at 970.   Moreover, Saine's argument that Victim B's identification lacked sufficient certainty and his critique that he was the only suspect at the show-up wearing a blue sweatshirt concern the reliability of Victim B's identification more than its suggestiveness.

Saine objects that the show-up with Victim B was unreliable for the same reasons that the show-up with Victim A was unreliable.  But the Magistrate Judge did not clearly err in determining otherwise under the totality of the circumstances.  Victim B's encounter with the juveniles who tried to take his car was brief, but soon after the incident he spotted the juveniles in a bigger group in the Walgreen's parking lot.  And the description of the male suspect that he provided in the 911 call generally matched Saine's appearance.  Indeed, both Saine and the male suspect wore blue hooded sweatshirts. Plus, despite Saine's objection that the show-up was not prompt, the show-up occurred roughly an hour after the attempted carjacking, which the Eighth Circuit has held was sufficiently timely.  *Hadley*, 671 F.2d at 1115 (finding the fact that the witnesses' identifications occurred within an hour of the crime weighed against suggestiveness). And even though Victim B demonstrated some uncertainty in his identification of Saine, he exhibited reasonable assuredness that, in combination with how close he was to the juveniles during the encounter and the amount of time that passed between the incident and identification, support reliability.  Under the totality of the circumstances, the show-up was sufficiently reliable for a jury to consider it.

\*       \*       \*

Because the Magistrate Judge's recommendations regarding the admissibility of Saine's show-up identifications by Victim A and Victim B were not clearly erroneous, the Court will deny Saine's motion to suppress the show-up identifications.

**B.      Motion to Suppress Fruit-of-the-Poisonous-Tree Evidence**

Saine also moves to suppress evidence that he claims was obtained as a result of an illegal search and seizure.  The Magistrate Judge concluded there was no fruit-of-the-poisonous-tree evidence because the officers had reasonable suspicion to conduct a *Terry* stop and probable cause to detain Saine: Saine was found in the immediate vicinity of the scene of an alleged crime with a firearm, his appearance matched Victim B's description of the suspect, and he ran from Sergeant Kelly.  Saine generally objects that he was impermissibly searched and detained and that any items found on his person should be suppressed.  He also argues that the second show-up identification at the PSB with Victim B should be suppressed because he never should have been transported to the PSB in the first place.  Saine's general objections are entitled to clear error review.  *Montgomery*, 98 F. Supp. 3d at 1017.

Evidence obtained through an illegal search or seizure must be suppressed under the fruit of the poisonous tree doctrine.  *United States v. Simpson*, 439 F.3d 490, 493–94 (8th Cir. 2006).  A warrantless search is "presumptively unreasonable" in violation of the Fourth Amendment.  *United States v. Ringland*, 966 F.3d 731, 735 (8th Cir. 2020).  However, a police officer may conduct a warrantless investigatory search "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous."  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

"Reasonable suspicion is a fact-specific inquiry, determined by the totality of the circumstances, taking account of an officer's deductions and rational inferences resulting from relevant training and experience." *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021) (citing *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)). Further, a warrantless arrest is appropriate if officers have probable cause—which occurs "when 'the facts and circumstances within the officers' knowledge . . . were sufficient to warrant a prudent person in believing that an offense has been committed.'" *Stepnes v. Ritzchel*, 663 F.3d 952, 960 (8th Cir. 2011) (quoting *United States v. Rivera*, 370 F.3d 730, 733 (8th Cir. 2004)).

The Magistrate Judge did not clearly err in concluding that officers had reasonable suspicion to search Saine and probable cause to arrest him under the totality of the circumstances. Saine was in the immediate vicinity of an alleged armed crime, his appearance matched the description of a male suspect that Victim B reported to 911, and he ran from Sergeant Kelly. The Eighth Circuit has found such factors support reasonable suspicion or probable cause. *See, e.g.*, *United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) (affirming reasonable suspicion where the encounter occurred near area where an attempted armed carjacking occurred days before); *United States v. Stokes*, 62 F.4th 1104, 1107 (8th Cir. 2023) (affirming reasonable suspicion where defendant matched the description of the suspect and ran from the officer); *Rivera*, 370 F.3d at 733 (affirming probable cause where defendant's suspicious behavior would lead trained officers to suspect a crime had just been committed). Because officers had reasonable suspicion and

-24-

probable cause to search and detain Saine, there was no illegal search or seizure. Accordingly, the evidence obtained from his person during his arrest and the show-up identification at the PSB are not inadmissible as fruit of the poisonous tree.  Accordingly, the Court will deny Saine's motion to suppress such evidence.

## CONCLUSION

Because Brent's statements in response to "So who had the gun?" are admissible under the public safety exception and because the R&R's recommendations regarding Brent's other statements and the show-up identification by Victim B were not clearly erroneous, the Court will deny Brent's motions to suppress her statements and Victim B's show-up identification.  Because the R&R's recommendations regarding the admissibility of Saine's show-up identifications by both victims and the evidence obtained during the *Terry* stop were not clearly erroneous, the Court will deny Saine's motions to suppress the identifications and evidence obtained from his person during his arrest.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Report and Recommendation [Docket No. 63] is **ADOPTED**;

2. Defendants' Objections to the Report and Recommendation [Docket Nos. 64, 65] are **OVERRULED**;

3. Defendant Brent's Motion to Suppress Statements [Docket No. 37] is **DENIED**;

4. Defendant Brent's Motion to Suppress Witness Identifications [Docket No. 38] is **DENIED**;

5. Defendant Saine's Motion to Suppress Impermissibly Suggestive and Unreliable Identification [Docket No. 34] is **DENIED**; and

6. Defendant Saine's Motion for Suppression of Evidence as a Result of Illegal Search and Seizure [Docket No. 35] is **DENIED**.

DATED:  September 4, 2024                          _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                               JOHN R. TUNHEIM
                                                   United States District Judge